IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS,
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| JON HAMILTON, CODY GEORGE, and MARTIN W. KOLODZIRE, Individually and On Behalf of Others Similarly Situated | § § § § § | |
| **PLAINTIFFS,** | § § § | |
| V. | § § | |
| ENERSAFE, INC. (f/k/a EnerSafe, LLC, TCSafety, Inc.); MICHAEL CHAD CUNNINGHAM (Individually and In His Official Capacity);  JASON ANDERSON (Individually and In His Official Capacity); RYAN MCMILLAN (Individually and In His Official Capacity); BOBBY BENNETT (Individually and In His Official Capacity); and GRYPHON OILFIELD SERVICES (a/k/a Gryphon Holdco, LLC & a/k/a and/or f/k/a EnerSafe, Inc.) | § § § § § § § § § § § § § § § | CIVIL ACTION NO. 15-CV-00965-DAE *LEAD CASE IN CONSOLIDATED ACTION* |
| **DEFENDANTS.** | § | |
| | **AND** | |
| ALFREDO WISE, MICAH CANNADY, RONNIE ARMSTRONG, JR., DRAKE GAFFORD, GERALD ANDERSON, and ALBERT LEE DOYAL, On Behalf of Themselves and All Others Similarly Situated | § § § § § § § | |
| **PLAINTIFFS,** | § § | CIVIL ACTION NO. 15-CV-973-OLG |
| V. | § § | *CONSOLIDATED WITH LEAD CASE NO. SA-15-CV-965-DAE* |
| EOG RESOURCES, INC. (f/k/a Enron Oil and Gas Company); ENERSAFE, INC. (a/k/a TCSafety and TCSafety, Inc. & f/k/a EnerSafe, LLC); and GRYPHON OIL FIELD SERVICES (a/k/a Gryphon Holdco, LLC & a/k/a and/or f/k/a EnerSafe, Inc.) | § § § § § § § § § | |
| **DEFENDANTS.** | § | |

|                                                              |     |                                                                                      |
|--------------------------------------------------------------|-----|--------------------------------------------------------------------------------------|
|                                                              | **AND** |                                                                                  |
| **BRANDON CHAUMONT, On Behalf of Themselves and All Others Similarly Situated** | § § § |                                                        |
|                                                              | §   |                                                                                      |
| **PLAINTIFF,**                                               | §   |                                                                                      |
|                                                              | §   | **CIVIL ACTION NO. 15-CV-1003-OLG**                                                  |
| **V.**                                                       | §   | *CONSOLIDATED WITH LEAD CASE*                                                        |
|                                                              | §   | *NO. SA-15-CV-965-DAE*                                                               |
| **EOG RESOURCES, INC. (f/k/a Enron Oil and Gas Company), AND** | §  |                                                                                     |
| **OAKS PERSONNEL SERVICES, INC. (a/k/a Oaks Group), and CIELO ENERGY CONSULTING, LLC** | § § § |                                   |
|                                                              | §   |                                                                                      |
| **DEFENDANTS.**                                              | §   |                                                                                      |

## DEFENDANT EOG RESOURCES, INC.'S RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR CONDITIONAL CERTIFICATION

Dated: March 28, 2017

Respectfully submitted,

*/s/ Carter Crow*

M. Carter Crow *(Admitted Pro Hac Vice)*
State Bar No. 05156500
carter.crow@nortonrosefulbright.com

Kimberly F. Cheeseman
State Bar No.  24082809
kimberly.cheeseman@nortonrosefulbright.com

Jesika Silva Blanco
State Bar No.  24098428
jesika.blanco@nortonrosefulbright.com

**NORTON ROSE FULBRIGHT US LLP**
1301 McKinney, Suite 5100
Houston, TX  77010-3095
Telephone:     (713) 651-5151
Facsimile:     (713) 651-5246

*Attorneys for Defendant EOG Resources, Inc.*

# TABLE OF CONTENTS

**Page**

SUMMARY ................................................................................................................... 1

RELEVANT PROCEDURAL HISTORY ................................................................... 4

FACTUAL BACKGROUND ........................................................................................ 5

    A.    EOG Uses Independent Contractors to Perform Many Oil Field Services ........... 5

    B.    The Wise and Chaumont Cases Seek to Certify Different Classes ..................... 6

        i.    Wise Case ............................................................................................. 6

        ii.    Chaumont Case .................................................................................... 7

    C.    The Wise and Chaumont Plaintiffs Were Independent Contractors ..................... 7

    D.    The Wise and Chaumont Plaintiffs Performed Vastly Different Job Duties ......... 8

        i.    Joshua Odom ......................................................................................... 8

        ii.    Micah Cannady ................................................................................... 11

        iii.    Alfredo Wise ...................................................................................... 12

        iv.    Roland "RJ" Johnson ......................................................................... 13

        v.    Cody George ...................................................................................... 15

        vi.    Drake Gafford .................................................................................... 16

        vii.    Brandon Chaumont ............................................................................. 17

        viii.    Gerald Anderson ................................................................................ 18

ARGUMENT AND AUTHORITIES ......................................................................... 18

    A.    A Higher Burden for Conditional Certification Applies After the Parties Have  Engaged in Pre-Certification Discovery .................................................... 18

    B.    Plaintiffs Cannot Use Consolidation to Merge the Cases Into a Single Cause of Action ................................................................................................ 20

    C.    The Wise and Chaumont Plaintiffs' Claims Require Two Highly Individualized Inquires that Preclude Conditional Certification ......................... 22

        i.    The Wise and Chaumont Plaintiffs' Factual Settings Are Too Disparate to Assess the Economic Realities Factors at a Later Stage in the Litigation ............................................................................. 22

        ii.    Even Assuming Employee Status, the Wise and Chaumont Plaintiffs' Factual Settings Are Too Disparate to Assess Exemption Status Across the Class ............................................................................. 26

        iii.    EOG's Defenses Are Too Individualized for a Manageable Collective Action .................................................................................... 28

        iv.    Procedural and Fairness Concerns Weigh Against Certification ........... 30

CONCLUSION ........................................................................................................... 30

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Aguirre v. SBC Commc'ns, Inc.*,
 No. H 05-3198, 2007 WL 772756 (S.D. Tex. Mar. 12, 2007).....................................................3

*Anani v. CVS RX Servs., Inc.*,
 730 F.3d 146 (2d Cir. 2013)......................................................................................................29

*Andel v. Patterson-UTI Drilling*,
 280 F.R.D. 287 (S.D. Tex. 2012)........................................................................................23, 26

*Badgett v. Tex. Taco Cabana, L.P.*,
 No. H-05-3624, 2006 WL 2934265 (S.D. Tex. Oct. 12, 2006) ...............................................18

*Bamgbose v. Delta-T Grp., Inc.*,
 684 F. Supp. 2d 660 (E.D. Pa. 2010) .................................................................................24, 26

*Blake v. Hewlett-Packard Co.*,
 No. 11-cv-592, 2013 WL 3753965 (S.D. Tex. July 11, 2013) ..........................................20, 22

*Casanova v. Gold's Texas Holdings, Grp., Inc.*,
 No. 13-cv-1161, 2014 WL 6606573 (W.D. Tex. Nov. 19, 2014) (Ezra, J.).....................19, 20

*Cator v. DXP Enters.*,
 No. 15-cv-179, U.S. District Court, Western District of Texas................................................29

*Christianson v. Newpark Drilling Fluids, Inc.*,
 No. H-14-3235, 2015 WL 1268259 (S.D. Tex. Mar. 19, 2015) ..................................23, 25, 26

*Demauro v. Limo, Inc.*,
 No. 10-413, 2011 WL 9191 (M.D. Fla. Jan. 3, 2011)..............................................................26

*Eberline v. Media Net, LLC*,
 636 F. App'x 225 (5th Cir. 2016) ............................................................................................22

*Frazier v. Garrison Indep. Sch. Dist.*,
 980 F.2d 1514 (5th Cir. 1993) ..................................................................................................21

*Gatewood v. Koch Foods of Miss.*,
 LLC, No. 07-cv-82-KS-MTP, 2009 WL 8642001 (S.D. Miss. Oct. 20, 2009) ......................30

*Gonzalez v. Tier One*,
 No. 12-cv-806, 2013 WL 1455587 (W.D. Tex. Apr. 8, 2013) .................................................25

*Green v. Harbor Freight Tools USA, Inc.*,
    888 F. Supp. 2d 1088 (D. Kan. 2012) ....................................................................30

*Harris v. Fee Transp. Servs., Inc.*,
    3:05-CV-0077, 2006 WL 1994586 (N.D. Tex. May 15, 2006) ................................20

*Hernandez v. Fresh Diet, Inc.*,
    No. 12-CV-4339, 2014 WL 5039431 (S.D.N.Y. Sept. 29, 2014) ............................24

*Hopkins v. Cornerstone Am.*,
    545 F.3d 338 (5th Cir. 2008) ..................................................................................23

*Johnson v. Big Lots Stores, Inc.*,
    561 F. Supp. 2d 567 (E.D. La. 2008) ...........................................................3, 27, 30

*Johnson v. TGF Precision Haircutters, Inc.*,
    No. H-03-3641, 2005 WL 1994286 (S.D. Tex. Aug. 17, 2005) .............................31

*Lipnicki v. Meritage Homes Corp.*,
    No. 10-CV-605, 2014 WL 5620603 (S.D. Tex. Nov. 4, 2014) ...............................28

*Lusardi v. Xerox Cor*p.,
    118 F.R.D. 351 (D.N.J. 1987) ...........................................................................19, 28

*Marshall v. Amsted Rail Co.*,
    10-CV-0011, 2012 WL 5499431 (S.D. Ill. Nov. 13, 2012) ....................................28

*Marshall v. Eyemasters of Tex., Ltd.*,
    272 F.R.D. 447 (N.D. Tex. 2011) ...........................................................................28

*Pacheco v. Aldeeb*,
    No. 14-cv-121-DAE, 2015 WL 1509570 (W.D. Tex. Mar. 31, 2015) .............19, 27

*Pena v. Handy Wash, Inc.*,
    No. 14-20352-CIV, 2015 WL 11713032 (S.D. Fla. May 22, 2015) .......................24

*Pfohl v. Farmers Ins. Grp.*,
    No. CV03-3080, 2004 WL 554834 (C.D. Cal. Mar. 1, 2004) ...................................3

*Prise v. Alderwoods Grp., Inc.*,
    817 F. Supp. 2d 651 (W.D. Pa. 2011) ....................................................................30

*Reich v. Homier Distrib. Co.*,
    362 F. Supp. 2d 1009 (N.D. Ind. 2005) ..................................................................28

*Villareal v. St. Luke's Episcopal Hosp.*,
    751 F. Supp. 2d 902 (S.D. Tex. 2010) ....................................................................28

**Rules and Statutes**

29 U.S.C. § 216(b) ....................................................................................1, 4, 6, 18, 22, 23, 26, 31

Fed. R. Civ. P. 23 .............................................................................................................................4

**Other Authorities**

29 C.F.R. § 541.201 (a)-(c)............................................................................................................29

29 C.F.R. § 541.601 .......................................................................................................................29

29 C.F.R. § 541.602 .......................................................................................................................29

29 C.F.R. § 541.604 .......................................................................................................................29

## EXHIBIT LIST

Exhibit A      →      Declaration of Gordon Goodman

  −  Exhibit A-1:   Master Services Agreements

Exhibit B      →      Deposition of Opt-in Plaintiff Cody George

Exhibit C      →      Deposition of Named Plaintiff Alfredo Wise

Exhibit D      →      Deposition of Opt-in Plaintiff Joshua Odom

Exhibit E      →      Deposition of Named Plaintiff Gerald Anderson

Exhibit F      →      Deposition of Opt-in Plaintiff Roland "RJ" Johnson

  −  Exhibit F-1:   E-mails Authored by Johnson

Exhibit G      →      Deposition of Named Plaintiff Brandon Chaumont

Exhibit H      →      Deposition of Named Plaintiff Micah Cannady

  −  Exhibit H-1:  Cannady Resume

Exhibit I      →      Deposition of Named Plaintiff Ronnie Armstrong

Exhibit J      →      Deposition of Opt-in Plaintiff Dicky Joe ("DJ") Helpenstill

Exhibit K      →      Deposition of Named Plaintiff Drake Gafford

## SUMMARY

This Fair Labor Standards ("FLSA") action involves three consolidated cases—*Hamilton*, *Wise*, and *Chaumont*.  EOG Resources, Inc. ("EOG") is a defendant in two of the cases—*Wise* and *Chaumont*, having been dismissed from the *Hamilton* case.  The *Wise* and *Chaumont* Plaintiffs' Motion  for FLSA Conditional Certification (Doc. 42) should be denied.  No common factual nexus binds the proposed class.   Instead, the *Wise* and *Chaumont* Plaintiffs are *dis*similarly situated, making this case profoundly unsuitable for collective adjudication.

Indeed, the Motion is deficient on its face.  First, Plaintiffs ignore the terms of this Court's consolidation order.  Doc. 27.  They wrongly presume that this case was consolidated for all purposes such that a single judgment can be entered.  To that end, contrary to the pleadings, including the different proposed class definitions set forth in those pleadings, they have now fashioned two new classes, a 1099 Class and a W-2 Class.  The 1099 Class purports to include the *Wise* and the *Chaumont* Plaintiffs.   Plaintiffs then attempt to show why conditional certification is appropriate for each of those classes (though largely relying on broad brush conclusory and unsupported statements).   In deciding whether conditional certification is appropriate, the class definitions as pled control, not the newly asserted groups that appear for the first time in the Motion.

Returning to the classes as pled, Plaintiffs have fallen well short of showing that conditional certification is appropriate here.  Instead, the evidence shows that the question of whether Plaintiffs in either proposed class were misclassified as independent contractors cannot be answered on a class-wide basis.  There is simply no common proof that applies across the entire proposed classes to determine whether Plaintiffs are employees, if they are employees, whether they are employees of EOG or employees of EOG's co-defendants or employees of both, and, if Plaintiffs are employees, whether they are exempt.  Plaintiffs have not demonstrated

1

that the putative class members are similarly situated for purposes of applying the all-important

economic realities test at the appropriate phase of this case in the future.  Rather, after months of

discovery, Plaintiffs' own testimony reveals significant and meaningful differences:

- Plaintiffs in the *Wise* case worked in over four different job positions, including the Shop Manager, Monthlies, $H_2S$ Techs, and Safety Professionals.  Some Plaintiffs also performed services for Production and in the corporate office.

- Although Plaintiffs' class definition in *Chaumont* encompasses several job positions, the Named Plaintiff and the current Opt-in Plaintiffs worked as $H_2S$ Techs only.

- Some Plaintiffs were paid between $200,000-$300,000.  Other Plaintiffs earned less than $100,000.

- Some Plaintiffs claim their work was "90% manual labor," whereas other Plaintiffs claim their work required zero manual labor.

- Some Plaintiffs purchased their own insurance whereas others did not.

- Some Plaintiffs formed their own LLC corporate entity, some Plaintiffs formed their own S-Corp, and some Plaintiffs did not form a corporate entity of any kind.

- Some Plaintiffs' family members participated in their LLC corporate entity.

- Some Plaintiffs filed taxes under their LLC corporate entity and filed individually.  Some Plaintiffs only filed their taxes individually.

- Not all Plaintiffs were paid the same.  Some Plaintiffs were paid a day rate of $400.  Others were paid a date rate of $800.

- Not all Plaintiffs contracted with the same co-defendants.  Some Plaintiffs contracted with one co-defendant.  Some Plaintiffs contracted with multiple co-defendants.  Plaintiffs' working relationship with the co-defendants varied.

- Some Plaintiffs provided contract services to other oil and gas operators like XTO and Antero.  Other Plaintiffs did not provide services to other oil and gas operators.

- Some Plaintiffs claim that the primary job duties involved "rigging up" and "rigging down" equipment.  Other Plaintiffs claim that their job never required them to rig up or rig down equipment.

- One Plaintiff claims his job duties require him to manage the Shop, and he is rarely out in the field.  Other Plaintiffs claim their job is in the field conducting safety

investigations on-site to determine compliance and presenting safety and training meetings.

- Some Plaintiffs expressly stated they wanted to become a contractor-consultant instead of an employee.

- Some Plaintiffs supervised the putative class members, but some did not.  In fact, one Plaintiff recommended EOG stop working with other putative class members.

- Two Plaintiffs allege retaliation claims, while most do not.

In sum, Plaintiffs' work experiences, job duties and responsibilities, and their relationship to EOG and the other co-defendants in this case, underscore the inadequacies and impracticality of trying these cases on a collective basis.  Federal courts frequently deny conditional certification when, as here, material dissimilarities in the alleged class are apparent.  *Johnson v. Big Lots Stores, Inc.*, 561 F. Supp. 2d 567, 579 (E.D. La. 2008) (denying certification and explaining that "[a]t a high level of generality opt-in plaintiffs' job duties may be similar in that they are subject to a uniform job description, are required to run individual stores according to corporate policies, and are supervised by store managers, [b]ut in terms of individual job duties, the evidence shows that the opt-in plaintiffs have different responsibilities from one another" such that adjudication on the merits cannot be done "on the basis of representative proof"); *Aguirre v. SBC Commc'ns, Inc.*, No. H 05-3198, 2007 WL 772756, at *13 (S.D. Tex. Mar. 12, 2007) (involving a case where defendant took the depositions of eight named plaintiffs who had the same job title and denying certification because "[t]he evidence in the record . . . shows that the [plaintiffs] had significant variation in the tasks that they are required to perform and the amount of time they spend on the different tasks" and noting that some plaintiffs were assigned to specific "specialty" duties"); *Pfohl v. Farmers Ins. Grp.*, No. CV03-3080, 2004 WL 554834, at *11 (C.D. Cal. Mar. 1, 2004) (denying certification in an independent misclassification case because of "the differing job duties and the individualized inquiry to determine whether these

varying duties meet the administrative exemption" and explaining there were differences among the contractors promoted to "lead adjusters" and other contractors who were "field" and "office" adjusters).

The same conclusion is warranted here. Accordingly, Plaintiffs' Motion should be denied.

## RELEVANT PROCEDURAL HISTORY

On June 17, 2016, this Court, as the first-filed Court, consolidated the following cases for discovery purposes: (1) *Hamilton v. EnerSafe, Inc., et al.*, No. 5:15-cv-00965-DAE; (2) *Wise v. EOG Resources, Inc. et al.*, No. 5-15-cv-00973-OLG; and (3) *Chaumont v. EOG Resources, Inc. et al.*, No. 5-15-cv-01003-OLG. Doc. 27. The Court did not consolidate the cases into a single cause of action in which one judgment could be entered. *Id.* at 6-8.

On September 23, 2016, Plaintiffs filed two motions: Motion for Leave to Certify as FLSA Collective Action and to Issue Notice in the *Hamilton*, *Wise*, and *Chaumont* lawsuits (Doc. 42); Motion for Leave to Certify an ERISA Class Relative to Rule 23 Class Action Claims in the *Wise* and *Chaumont* lawsuits (Doc. 44). The Court allowed EOG twenty-one days after completion of pre-certification depositions to file its responsive pleadings. Doc. 47.

On November 4, 2016, Plaintiffs filed an Amended Complaint in the *Hamilton* lawsuit, dropping EOG, and all claims against it from the case. Doc. 57. On November 3, 2016 and November 11, 2016, Plaintiffs agreed to drop all ERISA claims, including Rule 23 class claims, against EOG in the *Chaumont* lawsuit. *See* Docs. 52, 59. On January 17, 2017, Plaintiffs also agreed to dismiss all ERISA claims against EOG in the *Wise* lawsuit. *See* Doc. 72. Plaintiffs have since withdrawn their Motion to Certify a Class under ERISA. *See* Doc. 87.

On March 7, 2017, EOG completed its pre-certification depositions. Over the course of several months, EOG deposed six Named Plaintiffs—Gerald Anderson, Ronnie Armstrong,

Micah Cannady, Brandon Chaumont, Drake Gafford, and Alfredo Wise—and four Opt-in Plaintiffs—Cody George, Dicky Joe "DJ" Helpenstill, Roland "RJ" Johnson, and Joshua Odom.

The sole issue is whether a class should be conditionally certified under the FLSA in the *Wise* and *Chaumont* lawsuits.

## FACTUAL BACKGROUND

**A.     EOG Uses Independent Contractors to Perform Many Oil Field Services**

EOG is an independent oil and gas company.   Declaration of Gordon Goodman ("Goodman Dec.") at ¶ 3, attached as Ex. A.   Oil and gas companies like EOG contract with other companies to perform many of the activities in the oil field.   *Id.* at ¶ 4.   The field work is contracted out because it is typically specialized and temporary in nature.   *Id.* at ¶ 5.   For various purposes, EOG contracts with companies like EnerSafe, Inc., Oaks Personnel Services, Inc., and Cielo Energy Consulting LLC, which supply EOG with independent contractors, like the *Wise* and *Chaumont* Plaintiffs.   *Id.* ¶ 6-7.   More specifically, these companies provide EOG with independent contractors pursuant to a Master Services Agreement ("MSA") entered into and negotiated by EOG and the specific company.   *Id*.   Operators like EOG often contract for the various safety and environmental services performed in the oil field.   Deposition of Cody George ("George Depo.") at 40:22-41:9, attached as Ex. B.

As part of their MSAs with EOG, EnerSafe, Oaks, and Cielo agreed that any personnel provided to EOG would be independent contractors:

> In the performance of any Services by Contractor for Company, Contractor shall be conclusively deemed an independent contractor, with the authority and right to direct and control all of the details of the Services, Company being interested only in the results obtained. . . . It is the understanding and intention of the Parties hereto that no relationship of master and servant or principal and agent shall exist between Company and the employees, agents, or representatives of Contractor.

*See* MSAs ¶ 5A, attached here to as Ex. A-1.

The *Wise* and *Chaumont* Plaintiffs claim that they were wrongly labeled as independent contractors, but as demonstrated below, their job positions, pay, and relationship with EOG and the other co-defendants vary to such a great degree that their claims cannot be decided on a collective basis.  The vast distinctions among the Plaintiffs cannot be overcome.

B.     **The *Wise* and *Chaumont* Cases Seek to Certify Different Classes.**

   i.     *Wise Case*

Plaintiffs Alfredo Wise, Micah Cannady, Ronnie Armstrong, Jr., Drake Gafford, Gerald Anderson, and Albert Lee Doyal (collectively the "*Wise* Plaintiffs") allege that they were improperly paid as independent contractors on a day rate basis with no overtime compensation. Doc. 58 ¶¶ 1-10.  The *Wise* Plaintiffs sued EOG and EnerSafe, the company that provided them to EOG, alleging that EOG and EnerSafe are joint employers.  Doc. 58 ¶¶ 10, 140.  TCSafey, Inc. and TCConsulting are predecessor entities to EnerSafe.  Doc. 58 ¶¶ 65-66.  TCSafety, TCConsulting, and EnerSafe are often referred to interchangeably.[1]  Doc. 58 ¶¶ 65-66.  The *Wise* Plaintiffs later added Gryphon Oilfield Services as a defendant, alleging successor liability between EnerSafe and Gryphon.  Doc. 58 ¶¶ 75-93.

The *Wise* Plaintiffs seek to certify a class of individuals who worked as safety technicians, safety specialists, safety advisors, and/or safety consultants in EOG's South Texas/Eagle Ford Shale Operators but who were paid on a day rate and 1099 basis by EnerSafe and/or its predecessor company.  Doc. 58 ¶ 45.  Two of the *Wise* Plaintiffs—Cannady and Doyal—assert individual claims of retaliation under the FLSA.  Doc. 58 ¶¶ 12, 24, 44.  As of the filing date, twenty-seven (27) Opt-in Plaintiffs have joined the *Wise* case.  The putative class size

---

[1] *See also* Deposition of Alfredo Wise ("Wise Depo") at 113:2-114:6, attached as Ex. C; Deposition of Joshua Odom ("Odom Depo.") at 32:11-23, attached as Ex. D; Deposition of Gerald Anderson ("Anderson Depo.") at 54:14-20, attached as Ex. E; Deposition of Roland "RJ" Johnson ("Johnson Depo.") at 44:15-25, attached as Ex. F.

for *Wise*, excluding the current Opt-in Plaintiffs, is twenty-nine (29) additional potential class members.  Goodman Dec. at ¶ 9.

### ii.    *Chaumont Case*

Plaintiff Brandon Chaumont (the "*Chaumont* Plaintiff") alleges that he was improperly paid as an independent contractor on a day rate basis with no overtime compensation.  Doc. 56 ¶¶ 1-7.  The *Chaumont* Plaintiff sued EOG along with Oaks and Cielo, the companies that provided him to EOG, alleging that EOG, Oaks, and Cielo are joint employers.  Doc. 56 ¶¶ 7, 11 61, 83.

The *Chaumont* Plaintiff seeks to certify a class of individuals who worked in EOG's South Texas/Eagle Ford Shale Operations but had "job duties related to hydrogen sulfide, or poison gas, testing, and safety" and were paid on a day rate and 1099 basis by Oaks and/or Cielo. Doc. 56 ¶¶ 13, 127.  As of the filing date, five (5) Opt-in Plaintiffs have joined *Chaumont*.  All five worked as $H_2S$ Techs, although Plaintiffs' proposed class encompasses more job positions. Goodman Dec. at ¶ 10.  The putative class size for *Chaumont*, excluding the current Opt-in Plaintiffs, is thirty-three (33) additional potential class members.  *Id.*

## C.    The *Wise* and *Chaumont* Plaintiffs Were Independent Contractors.

Separately, the *Wise* and *Chaumont* Plaintiffs signed **individual** independent contractor agreements between themselves and EnerSafe, Oaks, and Cielo, agreeing to an independent contractor relationship while providing services to EnerSafe, Oaks, and Cielo's customers.  *See, e.g.*, George Depo. at 71:15-72:12; Deposition of Brandon Chaumont ("Chaumont Depo.") at 58:10-62:25, attached as Ex. G.  EnerSafe agreed to provide insurance to cover any negligence by the contractors while they were performing services for EOG.  George Depo. at 73:11-13; Deposition of Micah Cannady ("Cannady Depo.") at 90:12-91:15, attached as Ex. H. EnerSafe also agreed to defend, indemnify, and hold the contractors harmless for any actions that may

7

arise out of their services to EOG.  George Depo. at 73:24-74:8.  The Plaintiffs' work would fall into four distinct categories:

> H<sub>2</sub>S
> (1) Shop
> (2) H<sub>2</sub>S Support Technicians
> (3) Monthly Inspections ("Monthlies")
> Safety
> (4) Safety Professionals, which is further divided into four distinct disciplines (*e.g.*, drilling, completions, pipeline, workover, pipe yard)

Goodman Dec. at ¶ 8.  As demonstrated by Plaintiffs' own testimony, their work experiences, job duties and responsibilities, and the degree in which they economically depend on EOG varies as between independent contractors.

**D.      The *Wise* and *Chaumont* Plaintiffs Performed Vastly Different Job Duties.**

**i.      *Joshua Odom***

Opt-in Plaintiff Joshua Odom provided services to EOG as a Lead Safety Professional in the drilling discipline.  Odom Depo. at 44:13-23; 45:21-25.  Odom contracted with EOG through EnerSafe.  *Id.* at 18:24-19:5.  At the time Odom began providing services to EOG, he had approximately ten years of safety experience in the oilfield.  *Id.* at 17:22-24.  Odom bargained with EnerSafe over the terms of his compensation, getting EnerSafe to expressly agree that any pay raises would go directly to him and not EnerSafe.  *Id.* at 29:2-30:7.  While providing services to EOG, Odom was paid a day rate that varied from $550 to $800.  *Id.* at 37:23-38:20.  Odom always made more than $100,000 every year.  *Id.* at 38:22-39:11.  For example, in 2014, EnerSafe invoiced $249,000 to EOG for Odom's services alone.  *Id.* at 39:7-18.  Odom also set up two LLC corporate entities—JOMO Services, LLC and Big O Safety & Environmental—for tax advantages.  *Id.* at 89:19-92:11.  These LLC entities invoiced EnerSafe who then, in turn, invoiced EOG.  *Id.* at 70:24-71:8.

8

As a Safety Professional with EOG, Odom would serve as the on-site safety resource for third-party drilling companies. *Id.* at 42:14-43:15; 48:25-8. Odom would conduct drilling rig inspections, which involved walking around the rigs to determine whether workers were complying with safety and environmental regulations and policies. *Id.*; *see also id.* at 61:10-15; 63:10-64:1. Odom would enforce EOG and the Texas Railroad Commission's policies along with OSHA regulations. *Id.*; *see also id.* at 61:10-15; 63:10-64:1. Odom would also conduct safety meetings. *Id.* at 62:22-63:9. As the Lead, Odom served as the point of contact for five other Safety Professionals in the drilling discipline. *Id.* at 45:21-25; 47:13-48:10.

Odom's job as a Safety Professional was not a manual labor job. *Id.* at 81:1-3 ("Q. [W]ould you consider your -- your job as a drilling safety professional a manual labor job? A. No."). Odom's job duties were also different from those contractors in $H_2S$ Support. In discussing the $H_2S$ Techs, Odom stated "that was not my job." *Id.* at 42:7-43:8. Odom testified, "I've never been an $H_2S$ safety tech . . . **I didn't rig up and down $H_2S$ equipment.**" *Id.* (emphasis added).

Moreover, Safety Professionals did not perform the job duties of the Safety Professionals in other disciplines. For example, Named Plaintiff Ronnie Armstrong and Opt-in Plaintiff D.J. Helpenstill were both Safety Professionals in a different discipline than Odom—the pipeline discipline. As Armstrong explained:

> Q.     There are also safety professionals who worked in drilling. Did you do any of that?
> A.     Only during emergencies.
> Q.     So do you know Josh Odom?
> A.     I do. . . .
> Q.     **Based on your experience, did you do the same work that Josh Odom was doing in connection with drilling?**
> A.     **No.**
> Q.     There were also some safety professionals who worked in completions. Did you do any of that work in completions?

      A.      Only during emergencies.
      Q.      And there were also some safety professionals who worked in a workover.
              Do you do that work?
      A.      Again, only in emergencies.

Deposition of Ronnie Armstrong ("Armstrong Depo.") at 62:16-63:15 (emphasis added),

attached as Ex. I.  Helpenstill also worked in the pipeline discipline, and explained that EOG

management prohibited him from performing work in other disciplines:

      Q.      . . . . So you were primarily in the pipeline discipline?
      A.      Yes.
      Q.      And there was also a drilling discipline?
      A.      Yes.
      Q.      Did you do the work in the drilling discipline?
      A.      I was not allowed to.
      Q.      Okay.  Did you do the work in the completions discipline?
      A.      I wasn't allowed to.
      Q.      There was a workover division too?
      A.      Yes.
      Q.      Did you do the work in the workover discipline?
      A.      I was instructed not to.
      Q.      What about the pipe yard discipline?
      A.      From time to time I was able to go into the pipe yard, but not too often.  I'm going
              to say less than five times.  . . . . I was instructed by EOG management not to.
      Q.      Okay.  So you were supposed to stay within your pipeline discipline?
      A.      Correct.

Deposition of Dicky Joe "DJ" Helpenstill ("Helpenstill Depo.") at 81:4-82:5, attached as Ex. J.

      While Odom provided services to EOG as a contractor, Odom approached EnerSafe and

requested to become a W-2 employee of EnerSafe so that he could obtain a home loan.  Odom

Depo. at 82:18-83:7.  In particular, EnerSafe issued Odom a letter stating, "I am writing this

letter to certify that Mr. Josh Odom is currently employed as a TCSafety Safety Consultant.  He

has been a 1099 contractor but is now a W-2 employee with TCSafety with a fixed yearly salary

of $131,000."  *Id.*  Odom admitted that he asked EnerSafe to change his status to employee so

that he could secure a home loan.  *Id.* at 86:5-88:13.  After he received the home loan, Odom

admitted that he changed back to a 1099 contractor but failed to inform the bank.  *Id.; see also*

*id.* at 98:7-15 ("Q.  Now, in this lawsuit, are you trying to claim status as an employee because it's convenient to try to get money, just like you did when you were trying to get a loan?  A. I guess I plead the Fifth. . . .").

### ii.    *Micah Cannady*

Named Plaintiff Micah Cannady provided services to EOG as the Facilities Equipment Supervisor of the Monthlies Group.  Cannady Depo. at 46:25-48:17; 75:21-25.  Cannady initially contracted with EOG through EnerSafe and later Cielo.  *Id.* at 92:16-93:14.  Cannady was paid a day rate that varied from $400 to $600.  *Id.* at 98:2-18.  Cannady made more than $100,000 in every year that he provided services to EOG.  *Id.* at 99:18-100:24.  He set up a LLC corporate entity, Cannady Consulting, LLC, "to save money on taxes" and created a "cannadyconsulting@yahoo.com" e-mail for business purposes.  *Id.* at 13:8-24; 142:9-14.

Cannady admits that he was the only individual who worked as the Facilities Equipment Supervisor.  *Id.* at 75:21-76:6 ("Q. Were there other facilities equipment supervisors?  A.  No, sir.  Q.  Okay.  You were the only person who performed that job?  A.  Well, when I was gone, Gilbert Bazan would assume to make sure everything I had done right.  Q.  Okay.  Anybody else?  A.  No, sir."); *see also id.* at 77:6-9 ("Q. Okay.  For example, in terms of create and implement the monthly department, you were the only person who did that. Correct?  A. Yes.").  Cannady supervised a group of "guys" called the "Monthlies crew."  *Id.* at 48:25-50:24 ("Q. Those are the people who were basically on your monthlies crew. Is that correct?  A. That's correct, but not all at the same time.  Q.  Not all at the same time?  A. Right.  Q. But at one point or another they were –A. Yes, sir.  Q. –on that crew? All right.  And – you basically were in charge of making sure that crew did what it was supposed to do?  A. Yes.").

In the Monthlies Group, Cannady and his crew would travel to all of EOG's 800 facilities to monitor and test the equipment on site.  *Id.* at 46:25-48:17.  The group was called "Monthlies"

because this process had to be done every month.  *Id.*  Cannady "created routes to make sure everything was completed on a timely manner."  *Id.* at 51:12-52:17.  He also ordered supplies and arranged for vendors to come train his crewmembers.  *Id.*  At times, Cannady would help out the contractors in H$_2$S Support, but he admits that only a "few" of his Monthlies crew could do so, and that "most of the people either did one [Monthlies] or the other [H$_2$S]."  *Id.* at 55:25-56:13; 57:25-58:7.  Moreover, as head of the Monthlies Group, Cannady was not in the Shop, admitting that the Shop position was not his job.  *Id.* at 75:5-8 ("Q.  Okay.  A. I wasn't at the shop a lot.  Q. That wasn't really your job?  A. No.").  Unlike Odom, Cannady believes "90 percent" of his position involved manual labor.  *Id.* at 150:25-151:3.  Cannady's resume, however, indicates otherwise.  *See* Cannady Resume, attached as H-1.

### iii.    *Alfredo Wise*

Named Plaintiff Alfredo Wise provided services to EOG as the Shop Manager.  Wise Depo. at 57:11-58:8.  Wise began working as a W-2 employee of EnerSafe as a Fleet Manager/Field Technician.  *Id.* at 28:6-23.  In that position, Wise worked with several of EnerSafe's clients, including EOG and others.  *Id.* at 30:16-31:1.  After a year as the Fleet Manager/Field Technician, Wise became a 1099 contractor with EnerSafe and went to work as the Shop Manager for EOG.  *Id.* at 34:8-13.  Wise never set up a LLC corporate entity, and he paid his taxes in his own name only.  *Id.* at 114:20-25.  In some of the years that Wise provided services to EOG, he made over $100,000, but in other years, he did not.  *Id.* at 144:24-145:23.

As Shop Manager, Wise fixes, repairs, stores, and controls EOG assets.  *Id.* at 56:3-5.  Wise is the only person in the Shop, and the only person to have *ever* worked as the Shop Manager.  *Id.* at 77:8-16 ("Q. . . . Are you the only shop manager?  A.  I am currently the only shop person anything.  Q.  Okay.  Since 2011, has there ever been another shop manager?  A. No.").  Wise is known as "Dr. Wise" because he can repair almost any problem with equipment.

12

*Id.* at 73:21-74:15.  Wise contends that "99 percent" of his time is spent in the Shop and not in the field.  *Id.* at 99:8-12.

As the only person in the Shop, Wise testified that he can "only answer[] for [himself]" and does not know what the other Plaintiffs do.  *Id.* at 103:14-23 ("Q.  All right.  And on average -- A.  Like I'm only – I'm only answering for myself.  I'm not answering for the group.  Q. We've already – we've already established -- A.  Right.  Q. -- that you don't know what the other people do.  A.  Right.  Q.  Right?  A.  Right.").

      *iv.*    ***Roland "RJ" Johnson***

Opt-in Plaintiff Roland "RJ" Johnson provided services to EOG through EnerSafe in various positions:  $H_2S$ Tech, $H_2S$ Supervisor, and currently as an in-office administrator role. Johnson Depo. at 93:18-94:8 ("Q.  Ultimately there got to be two groups of $H_2S$ safety techs working at EOG through TC Consulting, correct?  There was a red group and a black group?  Do you know what I'm referring to?  A.  Yes.  It was -- that had to do with the hitches. . . .  Q.  All right.  You led one of the groups?  A.  Yes, I led one of the groups."); *see also id.* at 129:8-130:14 ("Q.  In fact, when the H2S safety groups – we talked about how there were two different teams, a red and a black team.  When those were combined to one team, ultimately you then within weeks were moved from working in the field to moving into the main office, the corporate office in San Antonio, correct?  A.  Yes, sir.").

Johnson initially worked as a W-2 employee of EnerSafe in $H_2S$.  *See id.* at 72:8-73:23; 82:10-16.  When Johnson was a W-2 employee of EnerSafe, he recommended to EnerSafe that the company staff dedicated individuals to certain oil and gas companies:

> Q.      And you said that you had some ideas that you thought were good ideas in terms of best practices in the H2S safety area?
> A.      Yes, sir.
> Q.      Can you give us an idea of what some of those ideas were?

> A.     So at the time everybody did everything.  You come in, hey, you're doing this, you're doing that, you're doing everything.  Like, I wanted to have, like, people that established relationships with certain company men, because the problem was, was that, say, Joe would go do this job.  He would go rig it up and set the equipment up and then they would get a call they were getting gas.  Well, then here comes Dan to come in and, you know, he doesn't know what's going on, the setup or anything like that.  He doesn't know the company man, and in a situation where there's hazardous gas, you don't have time to redo all that stuff.  **And so basically I was just saying, hey, why don't we establish relationships with company men and, you know, companies and stuff like that just for a better overall experience for the operators, you know.**

*Id.* at 47:24-48:20 (emphasis added).  In fact, the owner of EnerSafe, Michael Cunningham, asked Johnson to switch to the 1099 consulting side of the company to work for an oil and gas operator other than EOG.  *Id.* at 76:18-22 ("Q.  Okay. I'm sorry.  So Mr. Cunningham wanted you to switch over from TCSafety to TC Consulting but he wanted you to work for somebody else instead of EOG, correct?  A. Yes, sir.").

Johnson, however, ended up providing services to EOG.  He was paid a day rate of $600.  *Id.* at 82:14-16.  Johnson initially provided services as an $H_2S$ Tech, ultimately becoming an $H_2S$ Supervisor who led the "black team."   *Id.* at 93:18-94:11; 98:15-100:20.   In this position, he would assign jobs to other $H_2S$ Techs.  *Id.*  In fact, Johnson provided recommendations to EOG regarding which contractors to cut.   *Id.* at 127:21-128:20 and Ex. F-1 (explaining how he authored two e-mails to EOG with his "recommendations" on certain people with whom to stop contracting and explaining that "it was hard, because, you know, all these guys are my team and I had tried to make sure all my guys were good[,] so I tried to give him a good idea of, you know, people that I thought were the most capable").

After a downturn in the industry, Johnson started providing services to EOG in its San Antonio corporate office, where he currently still works.  *Id.* at 129:8-130:14.  Johnson took on an administrative role, working with tasks like restructuring EOG's training program.  *Id.*

    *v.*    ***Cody George***

Opt-in Plaintiff Cody George provided services to EOG as an $H_2S$ Tech in $H_2S$ Support. George Depo. at 94:18-20.  George initially began working as a W-2 employee of EnerSafe as an $H_2S$ Tech.  *Id.* at 56:13-19.  George admitted that EnerSafe paid him a monthly salary and required him to follow EnerSafe policies, including wearing a uniform.  *Id.* at 57:2-13; 61:3-13; 62:3-6.  As a W-2 employee of EnerSafe, George provided services as an $H_2S$ Tech to several companies, including EP Energy, XTO Energy, Kinder Morgan, and EOG.  *Id.* at 63:25-64:6. However, George eventually wanted to switch to "consultant" so that he could make more money:

> Q.    And what prompted you to leave SafZone for TCSafety/Enersafe?
> A.    Because of TCSafety's consulting side of it.  Their consulting section, I guess you'll call it.
> Q.    So you left because of the consulting section?  You wanted to be a consultant with TCSafety?
> A.    I wanted to eventually move into a consulting role.
> Q.    Why did you want to move into a consulting role?
> A.    Because it pays better.

*Id.* at 49:11-23.  Like he wanted, George switched to a 1099 consultant for EnerSafe, providing services to EOG as an $H_2S$ Tech.  *Id.* at 70:11-72:4.  George was paid a day rate of $400.  *Id.* at 75:18-23.  He never established his own LLC entity.  *Id.* at 56:11-12.  Before providing services to EOG, George received several certifications in $H_2S$.  *Id.* at 87:24-91:14.

George's primary job duties as an $H_2S$ Tech with EOG involved rigging up and rigging down $H_2S$ equipment along with on-site $H_2S$ supervision.  *Id.* at 118:17-119:3.  George admits that he was "not part" of the Monthlies group.  *Id.* at 94:21-96:12; 118:14-16.  Nor did he perform the job duties of Safety Professionals.  *Id.*  In the $H_2S$ group, there were two teams— Jose Ortega coordinated one team, and Opt-in Plaintiff Johnson coordinated the other.  *Id.* at

97:2-11.  In fact, George considered Opt-Plaintiff Johnson, to be one of his supervisors.  *Id.* at 97:7-11; 134:10-17.

### vi.    *Drake Gafford*

Named Plaintiff Drake Gafford provided services to EOG as an $H_2S$ Tech in $H_2S$ Support.  Deposition of Drake Gafford ("Gafford Depo.") at 23:12-14, attached hereto as Ex. K. Gafford initially began working as a W-2 employee of EnerSafe as an $H_2S$ Tech.  *Id.* at 13:6-17. He was then asked by the owner of EnerSafe, Michael Cunningham, to work as a 1099 consultant for XTO Energy.  *Id.* at 17:20-18:17.  Through EnerSafe, Gafford performed services for XTO as an $H_2S$ Tech for approximately one year.  *Id.* at 21:5-8.  XTO shut down its safety program, and, as a result, Gafford went back to working for EnerSafe as a W-2 employee.  *Id.*; *id.* at 22:3-8.  Gafford then switched to a 1099 status again and provided consulting services to EOG as an $H_2S$ Tech.  *Id.* at 22:6-23:14; 32:17-33:14.  Gafford was paid a day rate of $400 for his services at EOG.  *Id.* at 32:9-12.

As an $H_2S$ Tech, Gafford admits that he "didn't work doing monthlies . . . [t]hat was a different part of the department—or at least different people."  *Id.* at 61:7-17.  Likewise, Gafford acknowledged that he was not performing the same work as the Safety Professionals.  *See id.* at 61:18-62:23.

When providing services to EOG, Gafford established an LLC company for tax purposes that he managed with his father.  *Id.* at 40:14-42:17.  In particular, the company was a S-Corp in which his father owned a 49 percent interest.  *Id.*  Gafford's S-Corp filed a tax return, and Gafford also filed a tax return individually.  *Id.*

After EOG, Gafford went to perform work for Antero Resources.  *Id.*  at 7:5-8:10. Specifically, Gafford worked through Accurate Safety and Phoenix Contracting while providing services to Antero Resources.  *Id.* at 9:21-10:3.  Gafford worked as a contractor and was paid a

day rate while he performed services for XTO, EOG, and Antero.  *Id.* at 32:9-33:15 ("Q.  And at all three companies, XTO, EOG, and Antero, you worked on a contract basis, correct?  A.  Yes, sir.  Q.  Okay.  And you were paid on a day rate for your work at those companies, correct?  A. Yes, sir.").

### vii.    *Brandon Chaumont*

Named Plaintiff Brandon Chaumont provided services to EOG as an $H_2S$ Tech in $H_2S$ Support.  Chaumont Depo. at 76:14-78:7.  Before providing services to EOG, Chaumont had approximately five to six years of experience in the $H_2S$ field.  *Id.* at 29:1-32:2.  Chaumont initially contracted with EOG through Oaks and later switched to Cielo.  *Id.* at 39:1-6; 59:17-60:22.  When Chaumont switched to Cielo, he bargained with Cielo over his day rate.  *Id.* at 59:22-60:22.  Chaumont was paid a day rate of $500 and $550.  *Id.* at 43:22-44:25; 60:20-22.  Chaumont created his own LLC corporate entity for tax breaks, and he admits that he was requirement to carry certain liability insurance to use EOG's equipment.  *Id.* at 42:15-43:18; 91:25-92:1-3.

When providing services to EOG, Chaumont would set up the $H_2S$ equipment on-site, complete a job safety analysis, and then decide what needed to be done from an $H_2S$ perspective.  *Id.* at 82:12-83:4; 92:14-93:17.  Chaumont admits that he did not perform the job duties of those in the Monthlies group.  *Id.* at 77:15-78:3 ("Q.  And another category is the people who perform the – the monthlies.  Have you heard that term?  A. Yes.  Q. Okay.  And those are basically two different services.  Correct?  A. Yes.  Q. All right.  Can you describe for us what the monthlies do?  A. I believe they maintain all the production equipment, all -- all the production sites.  Q. Okay.  But you didn't do that work. Correct?  A. No.").

Chaumont worked on Opt-in Plaintiff Johnson's H$_2$S Tech team, explaining that Johnson distributed the work.  *Id.* at 79:9-80:25.  In fact, it was Johnson who recommended that EOG stop working with Chaumont.  *See* Johnson Depo. at 127:21-128:20 and Ex. F-1.

### viii.    Gerald Anderson

Although Named Plaintiff Gerald Anderson initially provided services to EOG through EnerSafe as an H$_2$S Tech, he also provided services to the "Production Department."  Anderson Depo. at 49:13-24 ("Q.  And around how long did you do this H2S safety tech position before you switched into the production position?  A.  A little under 18 months.").  Anderson admits that his Production work was different from his H$_2$S work, and that he did not report to the H$_2$S Tech supervisors.  *Id.* at 45:19-23 ("Q.  But it sounds like your – your production work was a little different, and you didn't necessarily report to Mr. Johnson or Mr. Ortega.  Is that correct?  A. That's correct, sir.).  Instead, Anderson reported to someone outside the S&E group—the lease operators and the regional managers over geographic regions.  *Id.* at 46:1-47:5.  Anderson explained that in Production, "[t]he difference is we managed ourselves."  *Id.* at 44:19-45:23.

## ARGUMENT AND AUTHORITIES

**A.    A Higher Burden for Conditional Certification Applies After the Parties Have Engaged in Pre-Certification Discovery.**

Section 216(b) of the FLSA permits an individual plaintiff to bring a lawsuit on "behalf of himself . . . and other employees similarly situated."  29 U.S.C. § 216(b).  The plaintiff bears the burden of proving that conditional certification of a class is warranted.  *Badgett v. Tex. Taco Cabana, L.P.*, No. H-05-3624, 2006 WL 2934265, at *1-2 (S.D. Tex. Oct. 12, 2006).  Certification is "by no means mandatory."  *Id.*

Although the Fifth Circuit has not endorsed a particular method for courts to use in deciding the issue of conditional certification, courts within the Western District of Texas most

commonly use the *Lusardi* "two-step" approach.  *See Casanova v. Gold's Texas Holdings, Grp., Inc.*, No. 13-cv-1161, 2014 WL 6606573, at *1 (W.D. Tex. Nov. 19, 2014) (Ezra, J.); *Lusardi v. Xerox Cor*p., 118 F.R.D. 351 (D.N.J. 1987).

The first step under *Lusardi* is the "notice stage," which occurs before the parties have conducted discovery, and requires the Court to determine whether to conditionally certify a class and issue notice to potential class members.  *Casanova*, 2014 WL 6606573, at *1-2.   In determining whether a plaintiff meets this threshold under the first *Lusardi* step, courts examine whether:  (1) there is a reasonable basis for crediting the assertion that aggrieved individuals exist; (2) those aggrieved individuals are similarly situated to the plaintiff in relevant respects given the claims and defenses asserted; and (3) those individuals want to opt in to the lawsuit.  *Pacheco v. Aldeeb*, No. 14-cv-121-DAE, 2015 WL 1509570, at *3 (W.D. Tex. Mar. 31, 2015).  The second step is the "decertification stage," which occurs after discovery is largely complete and involves a more stringent fact-intensive review to determine if the claimants are similarly situated.  *Id.*

Plaintiffs argue that the more lenient standard under the first step of *Lusardi* should apply.  But Plaintiffs cannot ignore that a more stringent standard applies when discovery related to conditional certification has occurred.   This Court has previously recognized that an "intermediate" standard of scrutiny applies after some discovery, noting that although "courts have not reached a consensus on what is required under this standard, [courts] ***agree that it is more than the standard burden at the notice stage***."  *Casanova,* 2014 WL 6606573, at *5 (emphasis added).

When discovery relating to the issue of collective action certification has occurred, the Court has more evidence available to assess the similarity of the Plaintiffs.  *Id.*  As is the case

19

here, allowing discovery on the issue of conditional certification "may underscore inadequacies in the group of potential plaintiffs." *Blake v. Hewlett-Packard Co.*, No. 11-cv-592, 2013 WL 3753965, at *7 (S.D. Tex. July 11, 2013) (internal quotation marks and citation omitted). With more of an evidentiary record, "the rationale for applying a limited, lenient inquiry at the notice stage loses its force." *Id.*; *see also Harris v. Fee Transp. Servs., Inc.*, 3:05-CV-0077, 2006 WL 1994586, at *3 (N.D. Tex. May 15, 2006) ("[W]here parties have had the opportunity to conduct discovery on the issue of certification, the similarly situated inquiry is more stringent.").

At the intermediate stage, "[i]t is proper to consider all evidence in the record, and from this evidence, to require more than the 'substantial allegations' that are normally sufficient at the notice stage." *Blake*, 2013 WL 3753965, at *4 (citations omitted). "When more evidence is available, courts typically consider three factors in determining whether potential plaintiffs are similarly situated. Such factors include (1) the disparate factual and employment settings of the individual plaintiffs, (2) the various defenses available to the defendant which appeared to be individual to each plaintiff, and (3) fairness and procedural considerations." *Harris*, 2006 WL 1994586, at *3. Plaintiffs cannot establish any of these factors. Moreover, even assuming the more lenient standard applies, Plaintiffs still cannot establish the second prong that requires the aggrieved individuals are similarly situated to the plaintiff in relevant respects given the claims and defenses asserted.

**B.    Plaintiffs Cannot Use Consolidation to Merge the Cases Into a Single Cause of Action.**

Plaintiffs' attempt to leverage consolidation of their separate cases into two new classes (a 1099 Class and a W-2 Class) should be rejected. "Consolidation is used to cover three procedurally different situations: (1) when a court stays all but one of several actions until that one is tried, at which point that judgment in the one trial is conclusive as to all others; (2) when a

court combines several actions into one action in which a single judgment is entered; and (3) when a court orders several actions to be tried together but each retains its separate character and requires entry of a separate judgment." *Frazier v. Garrison Indep. Sch. Dist.*, 980 F.2d 1514, 1532 (5th Cir. 1993). The combination of the multiple cases into a single action is discouraged. Courts prefer limiting consolidation to the third situation, meaning that the actions "maintain their separate identity even if consolidated." *Id.* (explaining that "case law has shown a preference for limiting consolidation to the third situation").

This Court's Order on consolidation makes clear that the three cases retained their separate character, the third *Frazier* situation. Doc. 27 at 6-8. Plaintiffs' Motion, however, blends all three cases, intermingling allegations and minimizing the fact that their Amended Pleadings seek different class definitions and involve different co-defendants. For instance, Plaintiffs' Proposed Notice and Consent to Join (Doc. 43-11, Pls' Ex. K) combines all the case captions improperly, fails to list all the defendants, fails to include the class definitions actually in their pleadings, fails to accurately describe the case, and shifts all the blame to EOG:

> This Notice is to tell you about a collective action lawsuit against EOG that may affect your potential rights to back earned wages and other damages under federal law. The name of the lawsuit is *Jon Hamilton, Cody George, Martin W. Kolodzire, Alfredo Wise, Micah Cannady, and Brandon Chaumont, on behalf of themselves and all others similarly situated v. Enersafe, Inc. f/k/a Enersafe, LLC, TCSafety, Inc., EOG Resources, Inc. f/k/a Enron Oil & Gas Company, Michael Chad Cunningham, Individually and in His Official Capacity, Jason Anderson, Individually and in His Official Capacity, and C. Ryan McMillan, Individually and in His Official Capacity,* Consolidated FLSA Action No. 5:15-cv-00965-DAE pending in the United States District Court for the Western District of Texas, San Antonio Division.

Doc. 43-11 (Pls' Ex. K). Plaintiffs' Proposed Order fares no better. It fails to use the proper class definitions and requests the Court to certify a class "working for EOG and one or more of the named third party Payor Defendants, EnerSafe, Oaks, Cielo, or Progressive" even though Progressive is not named as a defendant in any of the lawsuits. Doc. 42-1 (Pls' Order).

21

Plaintiffs would have this Court create confusion as to the identity of the classes, leaving EOG in a position defending an amorphous case.

**C.    The *Wise* and *Chaumont* Plaintiffs' Claims Require Two Highly Individualized Inquires that Preclude Conditional Certification.**

The claims asserted by the *Wise* and *Chaumont* Plaintiffs require two highly individualized inquiries:  (1) whether the Plaintiffs are independent contractors, and (2) if not, and the Plaintiffs are EOG employees, whether the Plaintiffs are exempt from the overtime requirements of the FLSA.  As demonstrated by their own testimony, these inquiries cannot be answered using collective proof.  *See Blake*, 2013 WL 3753965, at *5 (the purposes of collective treatment is so that "representative proof can be applied to all class members of the putative class at the merits stage; absent such a showing, there would be no efficiency in-and, therefore, no justification for collective adjudication").

**i.    *The Wise and Chaumont Plaintiffs' Factual Settings Are Too Disparate to Assess the Economic Realities Factors at a Later Stage in the Litigation.***

First, the *Wise* and *Chaumont* Plaintiffs' factual settings are too disparate, such that the "economic realities" factors cannot be applied in a representative manner to the alleged class.

The FLSA protects employees.  *See Eberline v. Media Net, LLC*, 636 F. App'x 225, 226-27 (5th Cir. 2016).  Without an employment relationship, there can be no FLSA violation.  When there is a dispute about whether the plaintiff is an employee of the defendant, then there is a question of whether the FLSA even applies.  As another court within this Circuit has recognized:

> Plaintiffs aver that all they need produce is *some evidence* that [Defendant] subjected a group of similarly situated potential class members to a single decision, policy or plan [in violation of] the FLSA.  **Plaintiffs would be correct if there was no question whether the putative plaintiffs fell under the protections of the FLSA, but, rather, only whether the class were similarly situated to one another and subject to a single decision, policy, or plan.  Here, however, the court must resolve first whether the FLSA even covers each Plaintiff and, therefore, each putative plaintiff.**

*Andel v. Patterson-UTI Drilling*, 280 F.R.D. 287, 295-96 (S.D. Tex. 2012) (emphasis added).

When there is a question about whether the plaintiff is an employee, some courts analyze at the conditional certification stage whether the "[putative collective action members] are similarly situated with respect to the analysis it would engage in to determine whether the workers are employees or independent contractors." *Andel*, 280 F.R.D. at 289. To determine if a worker qualifies as an employee for purposes of the FLSA, courts use the "economic realities" test, which focuses on five-factors: (1) the degree of control exercised by the alleged employer; (2) the extent of the relative investments of the worker and the alleged employer; (3) the degree to which the worker's opportunity for profit or loss is determined by the alleged employer; (4) the skill and initiative required in performing the job; and (5) the permanency of the relationship. *Hopkins v. Cornerstone Am.*, 545 F.3d 338, 343 (5th Cir. 2008).[2]

Here, the degree of control exercised by EOG varies among Plaintiffs. Plaintiffs' Motion provides no detail regarding the level of control, other than summarily stating that "EOG determined and controlled Plaintiffs' work on a daily basis." Doc. 42, Motion at 7. Plaintiffs' declarations are similarly devoid of details regarding how EOG controlled their work. To the contrary, Plaintiffs' deposition testimony reveals that the level of control varied. For instance, Cannady led his group of "guys" called the "Monthlies crew," creating and assigning the routes for his crew members, ordering supplies, and arranging training. Cannady Depo. at 48:25-50:24; 51:12-52:17. Johnson led a team of $H_2S$ Techs, and many of the Plaintiffs viewed him as one of their supervisors. Johnson Depo. at 93:18-94:8; George Depo. at 97:7-11; 134:10-17; Chaumont

_____

[2]To be clear, EOG is ***not*** asking the Court to apply a complete merits-based economic realities test at this stage of the proceeding. Instead, because there is no employment relationship, EOG is asking the Court to "evaluat[e] whether Plaintiff has demonstrated that he and the putative class members are similarly situated for purposes of applying the economic realities test at the appropriate phase of this case in the future." *Christianson v. Newpark Drilling Fluids, Inc.*, No. H-14-3235, 2015 WL 1268259, at *4 (S.D. Tex. Mar. 19, 2015).

Depo. at 79:9-80:25.  Anderson who started out as an $H_2S$ Techs eventually went into Production and admits that he managed himself.  Anderson Depo. at 43:11-44-25; 49:13-24.  In addition, Johnson admits that it was his "best practices" idea to have EnerSafe provide Operators like EOG with a dedicated group of workers.  Johnson Depo. at 47:24-48:20.  *Bamgbose v. Delta-T Grp., Inc.*, 684 F. Supp. 2d 660, 671 (E.D. Pa. 2010) (involving a staffing company that provided personnel to health care companies and denying plaintiff's motion for conditional certification because, among other things, the variances in control weighed against the possibility of determining independent contractor status on a collective basis); *see also Pena v. Handy Wash, Inc.*, No. 14-20352-CIV, 2015 WL 11713032, at *7 (S.D. Fla. May 22, 2015) (granting defendant's motion for decertification and noting that plaintiffs were unable to overcome distinctions identified by defendants in regards to the control element); *Hernandez v. Fresh Diet, Inc.*, No. 12-CV-4339, 2014 WL 5039431, at *6 (S.D.N.Y. Sept. 29, 2014) (finding certification inappropriate because plaintiffs' testimony varied with respect to the degree of control relevant to determining their alleged status as employees).

The relative investments also varied.  For instance, not all Plaintiffs were required to get their own insurance.  *Compare* Chaumont Depo. at 43:13-18; 91:25-92:1-3 ("I also had to carry certain liability insurance to pull EOG's trailer as well, so I had to pay for that."), *with* George Depo. at 74:9-11 ("Q.  Did you ever purchase insurance that covered your work?  A.  No.").  In addition, some Plaintiffs established their own LLCs, some established a S-Corp that they shared with relatives, and some Plaintiffs never created a corporate entity of any kind.  *Compare* Odom Depo. at 89:19-92:11 (creating two LLC corporate entities), with Gafford Depo. at 40:14-42:17 (establishing a S-Corp with his father), *with* Wise Depo. at 114:20-25 (no corporate entity); *see, e.g.*, *Christianson*, 2015 WL 1268259, at *4 (explaining that the relative investments will vary

because some plaintiffs had their own limited liability companies whereas others did not and explaining that some but not all plaintiffs bought their own supplies); *Gonzalez v. Tier One*, No. 12-cv-806, 2013 WL 1455587, at *2 (W.D. Tex. Apr. 8, 2013) (limiting certification because the "security guards retained individually by [defendant] are not similarly situated to security guards retained through third-party entities")

Moreover, the opportunity for profit or loss is different among the Plaintiffs. Some Plaintiffs bargained over the terms of their day rate. Odom Depo. at 29:2-30:7. Notably, not all day rates were the same. For instance, Gafford and George were paid a day rate of $400, but Odom was paid a day rate of $800. Gafford Depo. at 32:9-12; George Depo. at 75:18-23; Odom Depo. at 37:23-38:20. This difference in day rates is nearly the same as the putative plaintiffs in *Christianson*, a case in which the court denied conditional certification in part because the workers' opportunity for profit or loss varied based on their day rates. *See Christianson*, 2015 WL 1268259, at *4 (denying conditional certification in part because the days rates among class members varied between $405 to $995).

Nor did Plaintiffs work in jobs that required little skill or initiative. The Safety Professionals typically had 10 or more years of experience, and their expertise is reflected in their $200,000-$300,000 annual compensation. The personnel in Monthlies typically had less work experience, but EOG did not train them in the details of how to perform their job. Some Plaintiffs had extensive certifications before providing services to EOG. *Compare* George Depo. at 87:24-91:14, *with* Odom Depo. at 33:21-34:25. In addition, Operators often sought out contractors that specialize in these safety issues. *See, e.g.*, George Depo. at 40:22-41:9. For example, Gafford worked as a contractor and performed H$_2$S services for XTO, EOG, and

Antero.  Gafford Depo. at 32:9-33:15; *see also Bamgbose*, 684 F. Supp. 2d at 671 (denying conditional certification and noting that evidence to determine the degree of skill varied).

In sum, the putative class members' circumstances are too dissimilar with respect to the economic realities factors that will later need to be analyzed for FLSA coverage purposes to determine whether a worker was improperly classified.  The *Wise* and *Chaumont* Plaintiffs cannot ignore that the similarly situated standard must nevertheless be assessed with the economic realities factors in mind.  *See Demauro v. Limo, Inc.*, No. 10-413, 2011 WL 9191, at *3 (M.D. Fla. Jan. 3, 2011).  Accordingly, the need for individual analysis "eviscerates all notions of judicial economy that would otherwise be served by conditional class certification." *Christianson*, 2015 WL 1268259, at *4 (quotation marks omitted); *Andel*, 280 F.R.D. at 290.

### ii.     *Even Assuming Employee Status, the Wise and Chaumont Plaintiffs' Factual Settings Are Too Disparate to Assess Exemption Status Across the Class.*

Second, even assuming the *Wise* and *Chaumont* Plaintiffs were employees of EOG, their factual settings are still nevertheless too dissimilar to have their claims resolved on a collective basis.  Plaintiffs attempt to anchor their job duties to the buzzwords "$H_2S$" and/or "safety," alleging that David Watson and/or Kenneth Phillips hired them at EOG.  Motion at 4-5.  But Plaintiffs cannot create a cohesive class simply by discussing their job duties at a high level of generality.  Even their declarations submitted in support of certification reveal meaningful differences.  *Compare* Doc. 42-2, Pls' Ex. B ¶¶ 3-4 (explaining that as Shop Manager he primarily fixed equipment in the shop), *with* Doc. 43-3, Pls' Ex. C ¶¶ 2-4 (explaining that as a Safety Professional he "led daily safety meetings with all workers on a job site, including EOG employees, those designated as independent contractors, and any third party vendors who worked on site," investigated job sites, and audited workers for compliance).  As another court has recognized:

> At a high level of generality opt-in plaintiffs' job duties may be similar in that they are subject to a uniform job description, are required to run individual stores according to corporate policies, and are supervised by store managers.  But in terms of individual job duties, the evidence shows that the opt-in plaintiffs have different responsibilities from one another . . .

*Big Lots*, 561 F. Supp. 2d at 579.  The same holds true here.  For example, George testified that his primary job duties as an $H_2S$ Tech with EOG involved rigging up and rigging down $H_2S$ equipment.  *Id.* at 118:17-119:3.  Odom testified that "I've never been an $H_2S$ safety tech . . . **I didn't rig up and down $H_2S$ equipment.**"  *Id.* (emphasis added).  Wise admits that he is the only Shop Manager—in fact, the "only shop person anything."  Wise Depo. at 77:8-16.  But Cannady expressly admits that he "wasn't at the shop a lot" because the Shop was not his job.  Cannady Depo. at 75:5-8.

There are even differences within groups.  For instance, the Safety Professionals were not allowed to perform work in any other discipline.  Armstrong, a Safety Professional in the pipeline discipline admits that he knew Odom, but he did not do the same work as Odom who worked in drilling.  Armstrong Depo. at 62:16-63:15.  Helpenstill states that he was "instructed not to" perform work in any other Safety Professional discipline.  Helpenstill Depo. at 81:4-82:5.  Cannady worked in Monthlies, and George, Gafford, and Chaumont all admit that they did not perform Monthlies job duties.  Cannady Depo. at 48:25-50:24; George Depo. at 94:21-96:12; 118:14-16; Gafford Depo. at 61:7-17; Chaumont Depo. at 77:15-78:3.

Put simply, job duties matter.  As this Court has recognized, the similarity situated inquiry "requires similarity in job duties . . . in part because those factors determine whether an employee is exempt from the FLSA's requirements."  *Pacheco*, 2015 WL 1509510, at *7 (explaining that even though some of the area manager's job duties may have overlapped with those of the store managers, the area manager's job duties were still unique enough such that including the area manager in collective claims was inappropriate).

Moreover, the mere fact that EOG classified Plaintiffs as independent contractors is insufficient for collective treatment. *See Lipnicki v. Meritage Homes Corp.*, No. 10-CV-605, 2014 WL 5620603, at *3 (S.D. Tex. Nov. 4, 2014) ("[A] uniform classification alone may be insufficient to meet the certification standard."); *Reich v. Homier Distrib. Co.*, 362 F. Supp. 2d 1009, 1013-14 (N.D. Ind. 2005) (denying conditional certification because the potential class members had differing job duties and job positions and rejecting plaintiffs' argument that the plaintiffs were similarly situated because they all had the common claim that defendant misclassified them and failed to pay them overtime).

Nor is being part of the same department—EOG's S&E group—sufficient. *See Villareal v. St. Luke's Episcopal Hosp.*, 751 F. Supp. 2d 902, 918-19 (S.D. Tex. 2010) (excluding from the class definition groups that were part of the same larger IT Services department because employees in these groups had different specialties and duties); *see also Marshall v. Amsted Rail Co.*, 10-CV-0011, 2012 WL 5499431, at *8 (S.D. Ill. Nov. 13, 2012) (granting decertification and noting that the employees' principal activities and job duties were not the same even within a single department); *Marshall v. Eyemasters of Tex., Ltd.*, 272 F.R.D. 447, 450 (N.D. Tex. 2011) (denying conditional certification at the first *Lusardi* stage because "this case . . . seems to turn not only on whether or not multiple positions are similar to each other, but also whether employees within the same position were fulfilling the same tasks. It is clear . . . that an individual fact-finding will be necessary").

### iii.    EOG's Defenses Are Too Individualized for a Manageable Collective Action.

Under both the more lenient and intermediate standard, courts also consider whether the potential defenses are too individualized such that they inhibit the efficiency of proceeding on a collective basis. First and foremost, EOG submits that Plaintiffs were independent contractors, which, as explained above, is too individualized to apply the economic realities factors across the

entire class.  Even assuming Plaintiffs are EOG employees, EOG submits that Plaintiffs were nonetheless exempt under, among other things, the highly compensated employee and administrative exemption.[3]  29 C.F.R. § 541.602(a); § 541.201 (a)-(c); 541.200(a)(3).  Whether the administrative exemption applies involves an inquiry into whether the employee is performing non-manual work.  *See* 29 C.F.R. § 541.201 (a)-(c); 541.200(a)(3).  Odom expressly disavowed that he job involved any manual labor, whereas Cannady believes manual labor was "90 percent" of his position.  *Compare* Odom Depo. at 81:1-3, *with* Cannady Depo. at 150:25-151:3.  In addition, evidence exists that calls into question the credibility of some of Plaintiffs' claims, including Plaintiffs' own resumes touting their management responsibilities as well as their contradictory deposition testimony.  Accordingly, resolution of whether Plaintiffs are exempt cannot be determined by common testimony on a collective basis.  *See Green v. Harbor Freight Tools USA, Inc.*, 888 F. Supp. 2d 1088, 1103 (D. Kan. 2012) (finding that defendant's potential defenses would make collective treatment unmanageable because "Plaintiffs have not shown that they are similarly situated on many of the fact-specific issues that must addressed at

---

[3]  Plaintiffs assert that EOG is unable to prove any exemption because it fails the salary basis test.  Doc. 42, Motion at 5.  Plaintiffs fail to consider that payment of a day rate is, in effect, a minimum guaranteed weekly salary of at least one day's pay for each week in which any work is performed, and is, therefore, equivalent to a guaranteed weekly salary. *See Cator v. DXP Enters.*, No. 15-cv-179, U.S. District Court, Western District of Texas, Doc. 29, May 19, 2016 (report and recommendation denying plaintiff's motion for summary judgment and finding that a day rate can satisfy the salary basis test); *see also* 29 C.F.R. § 541.604 (stating that payment of minimum guaranteed salary plus extra pay does not violate salary basis requirement); 29 C.F.R. § 541.601 (stating that for highly compensated employees making more than $100,000 a year salary basis satisfied if pay includes at least $455 per week on a salary or fee basis); *see also Anani v. CVS RX Servs., Inc*., 730 F.3d 146 (2d Cir. 2013).  In addition, because Plaintiffs were working a regular schedule during the period of time they were paid a day rate, the day rate effectively guaranteed a regular weekly, bi-weekly, monthly or annual salary equivalent.  Satisfaction of the salary basis requirement need not be based on a guaranteed weekly salary.  Providing a guaranteed bi-weekly, monthly, or annual salary satisfies the requirement.  *See* 29 C.F.R. § 541.602 (salary basis satisfied by payment of salary on a weekly or less frequent basis).

trial on the merits of their misclassification claim," and noting that Plaintiffs "deposition testimony shows that it is not possible to develop common testimony").

### iv.    *Procedural and Fairness Concerns Weigh Against Certification*

Fairness considerations are often a basis for denial of a collective action as courts are certain not to let the goal of efficiency come at the expense of a defendant's substantive rights. *Gatewood v. Koch Foods of Miss.*, LLC, No. 07-cv-82-KS-MTP, 2009 WL 8642001, at *20 (S.D. Miss. Oct. 20, 2009); *Big Lots*, 561 F. Supp. 2d at 587.

Refusing to certify the cases does not unfairly disadvantage Plaintiffs, who retain the right to individually pursue their claims. *Prise v. Alderwoods Grp., Inc.*, 817 F. Supp. 2d 651, 677 (W.D. Pa. 2011). To the extent any of the Plaintiffs have credible claims, they benefit from having their claims tried separately from those Plaintiffs who lack interest or whose claims lack merit. For example, Johnson admitted in his deposition that he was no longer interested in being part of this lawsuit:

> Q.    Okay.  Mr. Johnson, I'm going to ask you about some statements I understand that you had made to Gordon Goodman [EOG Director of Safety and Environmental] within the last year.  Okay?Is it true that you told him within the last year that you weren't interested in being part of this lawsuit because you believe that EOG has treated you fairly?
> A.    Yes.

Johnson Depo. at 107:10-17.  For all the reasons discussed above, fairness and procedural considerations weigh against certification.  *Johnson v. TGF Precision Haircutters, Inc.*, No. H-03-3641, 2005 WL 1994286, at *7 (S.D. Tex. Aug. 17, 2005).

### **CONCLUSION**

Defendant EOG Resources, Inc. respectfully requests that the Court deny Plaintiffs' Motion for FLSA Conditional Certification (Doc. 42).

Dated: March 28, 2017

Respectfully submitted,

*/s/ Carter Crow*
M. Carter Crow *(Admitted Pro Hac Vice)*
State Bar No. 05156500
carter.crow@nortonrosefulbright.com

Kimberly F. Cheeseman
State Bar No.  24082809
kimberly.cheeseman@nortonrosefulbright.com

Jesika Silva Blanco
State Bar No.  24098428
jesika.blanco@nortonrosefulbright.com

**NORTON ROSE FULBRIGHT US LLP**
1301 McKinney, Suite 5100
Houston, TX  77010-3095
Telephone:      (713) 651-5151
Facsimile:      (713) 651-5246

*Attorneys for Defendant EOG Resources, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

This pleading was served on the following opposing counsel in compliance with Rule 5 of the Federal Rules of Civil Procedure on March 28, 2017.

**<u>Counsel for Plaintiffs:</u>**

Glenn D. Levy
Law Office of Glenn D. Levy
906 Basse, Suite 100
San Antonio, TX 78212
Tel.: (210) 822-5666
Fax: (210) 822-5650
glenn@glennlevylaw.com

Allen R. Vaught
Melinda Arbuckle
Baron & Budd, P.C.
3102 Oak Lawn Avenue, Suite 1100
Dallas, Texas 75219
Telephone: (214) 521-3605
Fax: (214) 520-1181
avaught@baronbudd.com

marbuckl@baronbudd.com

**Defendant EnerSafe, Inc. (Contact Information Pursuant to Docket No. 34)**

Robert Anderson
EnerSafe, Inc.
7700 San Felipe, Suite 490
Houston, Texas 77063
Telephone:  713-682-7423

**Counsel for Defendant Oaks Personnel Services, Inc.:**

Charles Sturm
Sturm Law PLLC
723 Main Street, Suite 330
Houston, Texas 77002
Telephone:  713-955-1800
Fax: 713-955-1078
csturm@sturmlegal.com

**Counsel for Defendant Cielo Energy Consulting, LLC:**
Larry Simmons
Sarah Dionne
Germer PLLC
P.O. Box 4915
Beaumont, Texas 77704
Telephone:  409-654-6700
Fax:  409-835-2115
enew@germer.com
sdionne@germer.com

**Counsel for Defendant Gryphon Oilfield Services:**
Anthony G. Stergio
Elaine Howard
Andrews Myers, PC
3900 Essex Lane, Suite 800
Houston, Texas 77027
Telephone:  713-850-4214
Fax:  713-850-4211
astergio@andrewsmyers.com
ehoward@andrewsmyers.com

_____/s/ Kimberly F. Cheeseman_____
Kimberly F. Cheeseman